UNITED STATES of America,
Plaintiff-Appellee,

v.

Armando CURRA–BARONA and
Humberto Montano,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Mariano VELUNZA–CALVAN,
Defendant-Appellant.

Nos. 82–5301, 82–5456.

United States Court of Appeals,
Eleventh Circuit.

June 6, 1983.

Rehearing Denied Aug. 23, 1983.

Emilia Diaz, court-appointed, Miami, Fla.,
for Humberto Montano.

Reemberto Diaz, Hialeah, Fla., for Armando Curra-Barona and Mariano Velunza-Calvan.

Stanley Marcus, U.S. Atty., Gregory C. Weiss, and Sonia Escobio O'Donnell, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

Amando Curra-Barona, Humberto Montano, and Mariano Velunza-Calvan appeal their convictions on drug charges, claiming that the government presented insufficient evidence to sustain the guilty verdicts. Based on the precedent of our prior cases involving virtually identical facts, we affirm.

On October 14, 1981, a United States Coast Guard cutter on routine patrol intercepted a forty-one foot pleasure craft, the DANNY. The vessel was stopped approximately five miles south of Great Inagua Island in the Bahamas. When the Coast Guard officers boarded the boat, they observed through the open cabin doors numerous bales of marijuana strewn about the cabin. They then arrested the seven persons aboard the DANNY, including the three appellants, and took them to Florida. The government subsequently obtained a two count indictment against them charging them with a conspiracy to possess marijuana and possession with the intent to distribute, in violation of 21 U.S.C. §§ 955a and 955c.

At the trial of Curra-Barona and Montano (Velunza-Calvan was tried at a later time), the government introduced the testimony of several Coast Guard officers and officials of the Immigration and Naturalization Service (INS). Those persons described the interception of the boat and their discovery of the marijuana. According to one of the witnesses, Montano served as the spokesman for the seven men in the conversations with the officers. He told them that the captain of the vessel was no longer on board, allegedly having departed on a small craft earlier that morning. All of the men claimed that they did not know either the name of the captain or his destination. Montano indicated that he had the responsibility of navigating the vessel for the remainder of the voyage. He further stated that none of the men knew what was contained in the bales. The officers also noted the disproportionally large quantity of marijuana contained in the rather small cabin of the boat. An INS official, who interviewed Curra-Barona and Montano upon their arrival in Florida, said that both men admitted knowing that the cargo was marijuana, and that Curra-Barona described himself as a crewman of the DANNY.

Through their own testimony, the defendants proffered an innocent explanation of their role in the DANNY's journey. They recounted that they were shipwrecked in the late spring of 1981, while en route to the Bahamas from Miami to repair a disabled boat. After floating on a life raft for four days, they were rescued by a British ship destined for Colombia. When they reached Colombia, they contacted a United States consulate and sought assistance in returning to this country. Although the American officials would not finance the return passage, they aided the men by attempting to reach relatives living in the United States. The consulate also informed Curra-Barona and Velunza-Calvan, who had immigrated to the United States from Cuba during the 1980 boatlift, that they would not be permitted to return since they had violated the terms of their special parole status. Documentary evidence, including various government communications, corroborated this initial chapter of their story.

The defendants then explained their alleged reasons for remaining in Colombia for several months. They claimed that they spent the time searching for transportation back to this country. According to their testimony, they were unable to find any vessel destined for the United States. Instead, they secured passage on the DANNY, which was traveling only as far as the Bahamas, with the hope of finding transportation to Miami from there. They stated that the captain of the DANNY agreed to take them along. The defendants alleged that they boarded the vessel at night on October 11, 1981, and that curtains obscured any view of the inside of the cabin that evening. They further testified that they were not allowed to see inside the cabin until the next morning, after the commencement of the voyage. They insisted that they were unaware of the marijuana on board until that time.

In the subsequent trial of Velunza-Calvan, the government relied upon essentially the same evidence, although much of that proof was presented in the form of a stipulation. The INS officer who initially interviewed the defendant in Florida testified that Velunza-Calvan admitted knowing that the boat contained marijuana and that he characterized his role on the vessel as that of a crewman. According to the official, he also claimed that the ship's intended destination was Miami. This statement contradicted those of the other men who asserted that the DANNY was bound for the Bahamas. In the presentation of his defense, Velunza-Calvan's testimony essentially paralleled the story told by the other two appellants in the previous trial. He revealed that, while in Colombia, he obtained $500.00 from his mother in the United States and approximately $120.00 from a friend to pay for transportation back to this country. He claimed, however, that upon learning that the United States would not permit his re-entry, he used the money to feed the other two men and himself during the following months. Still, like Curra-Barona and Montano, he alleged that he

boarded the DANNY merely to return to Florida.

The juries in both trials found each defendant guilty on both the conspiracy and the possession counts. These appeals followed. Before us, the three appellants urge that the government's evidence failed to establish a *prima facie* case of either conspiracy or possession.

■ At the outset, we note the well established standard by which this appeal must be reviewed. The evidence must be examined in the light most favorable to the government, accepting all reasonable inferences that support the verdict. *See, e.g., Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 ·L.Ed. 680, 704 (1942). From that perspective, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.) (Unit B *en banc*), *cert. granted,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).

■ In a recent line of cases, this court and the former Fifth Circuit Court of Appeals have found that standard satisfied by evidence indistinguishable from the proof adduced here. The court in *United States v. DeWeese,* 632 F.2d 1267, 1272 (5th Cir. 1980), *cert. denied,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981),[1] held that "the probable length of the voyage, the large quantity of marijuana on board, and the necessary close relationship between the captain and his crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt".[2] In *Freeman,* evidence of a ten day voyage, a large quantity of marijuana (41,000 pounds), and a "close relationship between captain and crew inferable from the length of the voyage and the size of the vessel" sustained the convictions for a conspiracy to import. 660 F.2d at 1035; *cf. Munoz,* 681 F.2d at 1374 (similar evidence sufficient to uphold a conviction for importation conspiracy); *Julio-Diaz,* 678 F.2d at 1033 (conspiracy to possess); *Riker,* 670 F.2d at 989 (possession).

■ In this instance, the government met the minimum showing required by this line of authority.[3] The length of the voyage (three days) at the time the DANNY was intercepted is of sufficient duration to support the inference that the appellants participated in the unlawful activity. *See Riker,* 670 F.2d at 989 (when stopped, marijuana laden boat was "three days from home port"). Similarly, ·the large quantity of marijuana (approximately ten thousand pounds) discovered aboard the vessel buttresses the deduction. *C.f. United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1982) (2,300 pounds); *Riker,* 670 F.2d at 989 (2,080 pounds); *Mazyak,* 650 F.2d at 791 (14,611 pounds). Finally, an inevitably close relationship between the captain and crew could be inferred from the length of the voyage (at least three days) and the size of the boat, only forty-one feet in this case. *See Riker,* 670 F.2d at 989; *United States v. Liles,* 670 F.2d 989, 992 (11th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982).

---

**1.** The decisions of the former Fifth Circuit, rendered prior to October 1, 1981, are binding upon this court, unless and until overruled or modified by the Eleventh Circuit sitting *en banc. Bonner v. City of Prichard,* 661 F.2d 1206, 1209–11 (11th Cir.1981) (*en banc*).

**2.** *See also United States v. Munoz,* 681 ·F.2d 1372, 1374 (11th Cir.), *modified,* 692 F.2d 116 (11th Cir.1982); *United States v. Julio-Diaz,* 678 F.2d 1031, 1033 (11th Cir.1982); *United States v. Riker,* 670 F.2d 987, 989 (11th Cir. 1982); *United States v. Freeman,* 660 F.2d 1030, 1035 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982); *United States v. Mazyak,* 650 F.2d 788, 790–91 & n.

2 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. Alfrey,* 620 F.2d 551, 556 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980).

**3.** To·a large extent, the factors are directed toward establishing a defendant's knowledge of the illicit enterprise underway on the vessel. *See, e.g., Mazyak,* 650 F.2d at 791 n. 2, *see also Julio-Diaz,* 678 F.2d at 1033. We note in that regard that all three defendants conceded, in response to post-arrest interrogation, that they knew the nature of their cargo at the time the DANNY was halted at sea.

**1092**

Nevertheless, the defendants maintain that, unlike in most of the prior cases, the government failed to produce any evidence that they were crew members. To the contrary, the testimony of the INS official established that both Curra-Barona and Velunza-Calvan, in their post-arrest statements, characterized their status aboard the DANNY as that of a crewman. In addition, a Coast Guard officer noted that, when describing the mysterious departure of the captain, Montano stated that he had the responsibility of steering the vessel to its intended destination. Thus, the defendants' own statements tend to refute their contention that they sailed on the DANNY merely as passengers, and not as crew members.

Taken together, this evidence satisfied the government's *prima facie* case, as delineated in *DeWeese*, on both the conspiracy and possession charges. *See Julio-Diaz*, 678 F.2d at 1033; *Riker*, 670 F.2d at 989. Confronted with that proof, "[t]he jury was certainly entitled to disbelieve [the defendants'] unlikely story that they were unaware of the marijuana until they were several miles from shore." *Liles*, 670 F.2d at 992. In short, under the precedents of this court, the evidence was sufficient.

Accordingly, the judgments are AFFIRMED.