UNITED STATES of America,
Plaintiff-Appellee,

v.

James RUSSO, Jr., John M. Capozzi, Jimmy Richardson Blanks, a/k/a Jimmy Blanks, Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James Richardson BLANKS,
Defendant-Appellant.

Nos. 81–6067, 82–5855.

United States Court of Appeals,
Eleventh Circuit.

Oct. 17, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 17, 1983.

Ronald Dion, North Miami Beach, Fla., Clyde M. Taylor, Jr., Tallahassee, Fla., for James Russo, Jr.

Paul D. Lazarus, Plantation, Fla., for John M. Capozzi.

Charles L. Jaffee, Hollywood, Fla., for Blanks.

Michael T. Simpson, Asst. U.S. Atty., Tallahassee, Fla., for United States.

Before HATCHETT and CLARK, Circuit Judges, and SCOTT *, District Judge.

PER CURIAM:

Appellants, James Russo, Jr., John M. Capozzi, and Jimmy Blanks, were convicted of conspiracy to possess with intent to distribute marijuana, conspiracy to import marijuana, and possession of marijuana knowing that it had been unlawfully imported in violation of 21 U.S.C.A. §§ 846, 963, and 955a(d), respectively.[1] Upon conviction, Blanks filed a motion for new trial based on newly discovered evidence, but the district court denied the motion. Blanks appeal of the denial has been consolidated with the appellants' appeal from their con-victions. We affirm the district court's denial and convictions.

## FACTS

On March 1, 1981, a United States Coast Guard pilot observed the ALASKAN I, a 200-foot freighter, approximately twelve and one-half miles off shore. As the pilot flew over the freighter, he overheard a radio communication stating, "It looks like the game wardens are in the area. Don't leave me Joe." Thereafter, the pilot instructed the Coast Guard cutter, Point Lobos, to approach and board the ALASKAN I. As the cutter approached the freighter, a small, white, blue-trimmed Bayliner containing four Americans including Russo, rendezvoused with the freighter to provide escape. As the boat stopped beside the freighter, various items were loaded onto the boat along with several individuals. After loading, the boat sped towards the shore. During the haste for shore, various papers and guns were thrown overboard. After the escape, the Coast Guard cutter pulled alongside the ALASKAN I. Upon boarding the freighter, the Coast Guard noticed that the sea strainers were opened and the engine room flooded. This observation directed their attention to 46,113 pounds of marijuana packaged in bales. Three days later, the Florida Marine Patrol discovered an abandoned, white blue-trimmed Bayliner stripped of all its gear on the Fenholloway River. The United States Customs Service consequently confiscated the boat after discovering that the blue paint scrapings found on the side of the Bayliner matched the paint of the ALASKAN I.

An employee of the marina located near the Fenholloway River testified that a group of men arrived at the marina on

---

\* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, was a member of the panel that heard oral arguments but due to his death on May 12, 1983 did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. 46(d).

1. Co-defendant Flavio Cobos was tried with Russo, Capozzi, and Blanks. The district court granted a judgment of acquittal in favor of Cobos on two counts and the jury acquitted Cobos on the final count. Co-defendant Russell Pellerito was a fugitive at the time of the appellants arrest, but was subsequently arrested. Following his arrest, Pellerito pled guilty to a conspiracy count and received a fifteen year sentence.

February 27, 1981, driving a Chevrolet Blazer with a twenty-six or twenty-eight foot white, blue-trimmed Bayliner in tow. On the following day, after receiving a telephone call, the men went out in the Bayliner never returning. The marina employee further testified that the weather was such that he would not have taken a boat out "unless it was an emergency."

The Chevrolet Blazer, abandoned at the marina was registered to a corporation, and signed by Russo as the corporation's vice-president. The Bayliner and trailer were registered to Gary Combs. Inside the abandoned Blazer, a garment bag was found containing a calculator and pad of paper. The calculator contained a series of printed tapes listing wrapping descriptions, code letters, and sequence numbers matching the markings on the bales of marijuana found on the freighter. The pad of paper listed the navigation directions to the Fenholloway River and marina. Two cameras found inside the Blazer revealed pictures of Russo. Additionally, Russo's fingerprints were found on several items in the Blazer including a detachable trailer tail-light, the tailgate of the Blazer, a magazine, and a beer can. Capozzi's fingerprints were found on one of the trailer's tail-lights.

Simon Torres and Guadalupe Lopes Thompson were employees on the ALASKAN I during the period in question. According to Torres and Thompson, the ALASKAN I, after repairs in Panama, sailed for Colombia where marijuana was loaded upon the freighter before heading to the United States. Further testimony of Torres and Thompson revealed that an English-speaking person named ";Russell" met the ALASKAN I in Panama and Colombia. Both Torres and Thompson testified that Russo and Russell occupied the white, blue-trimmed boat that met the ALASKAN I off the coast of the United States. Torres, Thompson, and other crew members on the ALASKAN I escaped in this boat.

The government's principal witness, James Hester, provided extensive testimony concerning prior occasions when he and the appellants imported marijuana using a Bayliner. Hester was recruited by the Drug Enforcement Administration (DEA) in the fall of 1980. He testified that in April 1980, he, along with Blanks, Russo, Capozzi, Combs, and Johnny Zatolla towed the ACE HIGH, a Bayliner, behind a cabin cruiser to the Bahamas. Hester, Blanks, and Combs returned to the United States in the Bayliner with 1,100 pounds of marijuana in a hidden compartment. Russo, Capozzi, and Zatolla planned to return with a load of marijuana in the cabin cruiser, but were unsuccessful. Blanks, Combs, and Russo subsequently split $45,000, which apparently had been obtained from selling the marijuana, and paid Hester $2,000.

Hester further testified that he and Combs made another trip to the Bahamas two days later in the ACE HIGH. During that trip, they imported approximately 1,200 pounds of marijuana. Once again, Hester was paid $2,000; Blanks, Russo, and Combs split approximately $45,000. Hester was paid another $2,000 for importing a third load of marijuana on the ACE HIGH with Blanks and Combs approximately six to eight weeks later. During this same period, Russo and Zatolla also imported a load of marijuana onboard a new Bayliner purchased by Russo, Blanks, and Combs. This is the Bayliner that later rendezvoused with the ALASKAN I and was seized by United States Customs.

In July of 1980, Hester assisted Russo, Blanks, and several other individuals in unloading a shipment of marijuana from the new Bayliner. Shortly thereafter, Combs, Blanks, and Capozzi ran the new Bayliner aground while attempting to import another load of marijuana. The Bayliner was subsequently repaired. In late July of the same year, Capozzi paid Hester $500 to assist in unloading another shipment of marijuana.

In early August of 1980, Blanks, Hester's brother-in-law, moved from Florida to Georgia. Hester testified that Blanks indicated that he wanted to stop smuggling marijuana, but "would have to do at least one load a year." Blanks then mentioned

that 60,000 pounds of marijuana would be imported from Colombia later that year. According to Hester, Blanks indicated his intention to participate in that smuggling operation and, in furtherance of that participation, proceeded to obtain a passport for his trip to Colombia. Hester's testimony further revealed that Russo indicated that such a shipment was expected from Colombia, but that delay was probable. In January of 1981, Blanks questioned Hester about the notes he was keeping on the smuggling operations. During the period from early January, 1981, through early March, 1981, when the ALASKAN I was seized, numerous telephone calls were made and monitored between Blanks, Russo, and Capozzi. Some of these taped telephone conversations were admitted into evidence. The appellants were arrested, indicted, and tried before a jury and found guilty on all counts. Blanks filed a motion for new trial on the grounds of newly discovered evidence, which the district court denied. Blanks now appeals the denial of a motion for new trial, and the appellants appeal their convictions. We must now review the merits of their arguments.

## ANALYSIS

### A. Sufficiency of the Evidence

█ Blanks contends that the government's evidence was insufficient to establish his knowing participation in the conspiracy. Accordingly, Blanks argues that the district court erred in denying his motion for judgment of acquittal. We must examine the evidence in a light most favorable to the government, accepting all reasonable inferences which will support the verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Curra-Barona,* 706 F.2d 1089, 1090–91, 3224, 3226 (11th Cir.1983). The applicable standard is whether a reasonable jury could conclude that the evidence established guilt beyond a reasonable doubt. *United States v. Pierre,* 688 F.2d 724, 725 (11th Cir.1982); *United States v. Roper,* 681 F.2d 1354, 1359 (11th Cir.1982). If a reasonable jury would necessarily en-

tertain a reasonable doubt as to the defendant's guilt, the conviction must be reversed. *United States v. Marx,* 635 F.2d 436, 438 (5th Cir.1981). The Fifth Circuit stated, however, that "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc) (footnote omitted). We now turn to the relevant substantive issue presented by Blanks.

█ To support a conspiracy conviction, the government must prove that an agreement existed between two or more persons to commit a crime, and that the defendant knowingly and voluntarily joined the agreement. *United States v. Badolato,* 701 F.2d 915, 919–20 (11th Cir.1983); *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982). The government need not prove that the defendant knew all the details of the conspiracy; rather, it need only be shown that the defendant knew the general nature and scope of the conspiracy and intended to participate. *Cuni,* 689 F.2d at 1356; *United States v. Watson,* 669 F.2d 1374, 1380 (11th Cir.1982). In conspiracy cases brought under 21 U.S.C.A. § 846, the government is not required to prove the commission of an overt act in the furtherance of the conspiracy. *Cuni,* 689 F.2d at 1356. Mere knowledge of a conspiracy in association with the conspirators is insufficient evidence to support a conspiracy conviction. *See United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983). Direct evidence of a defendant's intent to join in a conspiracy is not required. If circumstantial, participation may be proved by circumstantial evidence. *United States v. Lee,* 694 F.2d 649, 652 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983); *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.1982).

Blanks argues that the evidence merely establishes his prior association with Russo

and Capozzi in other marijuana smuggling operations. Blanks contends that it cannot be assumed that he was involved in the ALASKAN I smuggling operation because of Russo and Capozzi's involvement in that conspiracy. Viewing the evidence in a light most favorable to the government, we find that the record indicates otherwise.

█ Viewing this evidence, we cannot say that the jury would have a reasonable doubt as to Blanks's guilt. Hester's testimony revealed Blanks's extensive knowledge of the ALASKAN I smuggling operation, and his expressed intent to participate in the conspiracy. Circumstantial evidence proved (1) that Blanks participated in prior smuggling operation with Russo and Capozzi, (2) his joint ownership of the Bayliner, (3) his numerous telephone conversations with the other conspirators during the two months prior to the seizure of the ALASKAN I, and (4) his self-incriminating statement provided further support for a finding of knowing participation in the conspiracy charge. The evidence presented by the government was forceful enough to include Blanks's participation. Accordingly, we conclude that a reasonable jury could have found beyond a reasonable doubt that the evidence established Blanks's knowing participation in the conspiracy, and that the district court did not err in denying Blanks's motion for a judgment of acquittal.

### B. *Motion for New Trial*

Blanks argues that the district court erred in denying his motion for new trial based on newly discovered evidence. In supporting his motion, Blanks offered the testimony of the co-defendant, Russell Pellerito. Pellerito was a fugitive at the time of the trial, but was subsequently apprehended. Following his arrest, Pellerito entered a guilty plea to Count I of the indictment charging conspiracy to possess with intent to distribute marijuana. In an affidavit, and during an evidentiary hearing, Pellerito stated that in August of 1980 Blanks indicated he was not interested in participating in the ALASKAN I smuggling operation and was planning to move to Georgia. Pellerito further testified that while he and Russo were on the Bayliner en route to the ALASKAN I, Russo told him that Blanks was not involved in the ALASKAN I operation. Finally, Pellerito stated he had not seen Blanks during the ALASKAN I operation.

█ A motion for new trial is addressed to the sound discretion of the trial court. Consequently, the denial of the motion for new trial will not be reversed unless an abuse of discretion is found. *United States v. Mesa*, 660 F.2d 1070, 1077 (5th Cir.1981); *United States v. Martino*, 648 F.2d 367, 407 (5th Cir.1981). To prevail on a motion for new trial, the defendant must establish the following prerequisites:

(1) the evidence must be newly discovered and have been unknown to the defendant at the time of trial;

(2) the evidence must be material, and not merely cumulative or impeaching;

(3) the evidence must be such that it will properly produce an acquittal; and

(4) the failure to learn of such evidence must be due to no lack of diligence on the part of the defendant.

*Bentley v. United States*, 701 F.2d 897, 898 (11th Cir.1983); *Mesa*, 660 F.2d at 1077. In denying the motion for new trial, the district court concluded that it was not likely that Pellerito's testimony would have produced a different result. The district court noted that the government introduced a substantial amount of evidence against Blanks. The evidence against Blanks was the same as earlier indicated as proof of his involvement in the conspiracy to import. In addition, the district court noted that Pellerito did not assert that he knew all of the persons involved in the ALASKAN I smuggling operation, or that he was involved in all phases of that conspiracy. Accordingly, the district court concluded that Pellerito's testimony merely indicated that he did not have first-hand knowledge of Blanks's involvement in the conspiracy.

Although Pellerito's testimony is relevant and material, it is not so substantial as to be likely to produce a different result. In

view of the other evidence against Blanks, we cannot say that the district court abused its discretion in denying the motion for new trial.

## C. *Prior Similar Acts*

Appellants contend that the district court erred in admitting Hester's testimony concerning appellants' involvement in prior marijuana smuggling operations. They assert that the prejudicial effect of admitting such a substantial amount of evidence of prior similar acts under rule 404(b) of the Federal Rules of Evidence, outweighs its probative value and, thus, should be excluded under rule 403.

█ Determinations as to the relevancy of evidence are well within the broad discretion of the district courts and will not be disturbed on appeal absent a showing that the trial court abused its discretion. *United States v. Kopituk,* 690 F.2d 1289, 1319 (11th Cir.1982); *United States v. Bulman,* 667 F.2d 1374, 1382 (11th Cir.1982).

█ Rule 404(b) prohibits the admission of evidence of prior similar acts for the purpose of proving bad character, but provides that such evidence is admissible to prove, among other things, intent.[2] *Kopituk,* 667 F.2d at 1334. In determining whether extrinsic offense evidence is admissible to prove intent under rule 404(b), the following two-step test must be applied:

First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by the undue prejudice and must meet the other requirements of rule 403.

*United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed. 472 (1979) (footnote omitted). The relevancy of the extrinsic offense evidence is measured by the similarity of the extrinsic offense to the offense charged. *Kopituk,* 690 F.2d at 1334; *Beechum,* 582 F.2d at 911. The relevancy of extrinsic offense evidence to intent is determined by comparing the state of mind of the defendant in perpetrating both—the extrinsic and contemporaneous—offenses. *Kopituk,* 690 F.2d at 1334.

█ The extrinsic offense evidence in the instant case establishes that Blanks, Russo, and Capozzi were involved in several prior marijuana smuggling operations. Although the amount of marijuana imported on each of the prior smuggling trips were substantially less than the shipments of the marijuana onboard the ALASKAN I, the extrinsic offenses are otherwise similar to the offense charged. Consequently, in light of the close similarity between the extrinsic and charged offenses, it is clear that the evidence of prior similar acts is relevant to the issue of intent.

Having concluded that the first part of the test has been met, we must now determine whether under rule 403, the probative value of the extrinsic offense evidence is substantially outweighed by its potential unfair prejudicial effect.[3] *Beechum,* 582 F.2d at 911. In *Beechum,* the court held that extrinsic offense evidence may be unfairly prejudicial to the extent that it is likely to confuse the issues, mislead the jury or cause undue delay. 582 F.2d at 914. In applying this part of the test, we must be mindful of not only the similarities of the extrinsic offense evidence to the offense charged, but also the necessity of admitting such evidence to prove the elements of the

**2.** Fed.R.Evid. 404(b) provides:

*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**3.** Fed.R.Evid. 403 provides:

*Exclusion of relevant evidence on grounds of prejudice, confusion, waste of time.* Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

offense charged. If the government lacks sufficient evidence of intent, the probative value of the extrinsic offense evidence will most likely outweigh any possible unfair prejudice. Conversely, if the defendant's intent is uncontested, then any nominal probative value of the extrinsic offense evidence would undoubtedly be outweighed by the danger of unfair prejudice. *Kopituk,* 690 F.2d at 1334; *Beechum,* 582 F.2d at 914.

Appellants contend that intent is not an issue because they did not specifically assert lack of intent as a defense, but rather generally denied any involvement in the conspiracy. Accordingly, appellants assert that the probative value of the extrinsic offense evidence was substantially outweighed by its potential unfair prejudicial effect.

The former Fifth Circuit in *United States v. Roberts,* 619 F.2d 379 (5th Cir.1980), however, held that a defendant's plea of not guilty places his intent in issue. In *Roberts,* the court stated that:

> In every conspiracy case ... a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government. Evidence of such extrinsic offenses as may be probative of the defendant's state of mind is admissible unless he "affirmatively take[s] the issue of intent out of the case."

619 F.2d at 383. Consequently, intent is still an issue unless the defendant takes affirmative steps to remove the issue from the case, such as a stipulation. 619 F.2d at 383 n. 2. Thus, mere denial of participation in a conspiratorial act is insufficient to remove the issue of intent from the case.

In the instant case, the appellants' defense of lack of involvement is insufficient to remove the issue of intent from the case. The record indicates no stipulation concerning the issue of intent nor does the record indicate that the appellants planned to admit intent if their participation in the conspiratorial acts were established. Consequently, the government was not relieved of its burden of proving intent. Accordingly, we hold that the evidence of prior similar acts was relevant to the issue of intent and its probative value outweighed its po-

tential prejudicial effect. Therefore, we conclude that the district court did not abuse its discretion in admitting the extrinsic offense evidence.

Additionally, the appellants raises two other arguments: (1) that the district court erred in prohibiting the admission of certain impeachable evidence against Hester, the government's witness; and (2) the district court erred in admitting a co-conspirator statement against penal interest by an unavailable declarant under rule 804(b). We, however, find no merit to these arguments, and affirm the district court's conclusions.

CONCLUSION

We find that the appellants' arguments are without merit, and affirm the district court's convictions and denial of Blanks's motion for new trial.

AFFIRMED.