**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-10284

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

VICTOR YOEL PEREZ CREMADES,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00221-TPB-SPF-1

————————————————

Before ROSENBAUM, LAGOA, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

A jury found Victor Cremades guilty of two drug distribution crimes in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. The district court sentenced him to 180 months imprisonment on

each count to run concurrently. Cremades appeals both convictions arguing that the district court: 1) erred in denying his motion for a judgment of acquittal based on the insufficiency of the evidence to support either conviction and 2) abused its discretion at trial when it admitted a "drug ledger" into evidence. We are not persuaded.

**I.**

A federal grand jury indicted Cremades for conspiracy to possess with intent to distribute 500 grams or more of methamphetamine and 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count I), and possession with intent to distribute those drugs, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count II).

At trial the government presented the following evidence. In September 2021, law enforcement intercepted a FedEx package addressed to "Oliver Holme" at 4813 North MacDill Avenue, Tampa, Florida 33614. The package contained almost four pounds of methamphetamine and more than 1,200 pills laced with fentanyl — approximately $40,000 worth of drugs. Further investigation revealed that there was no Oliver Holme residing in Florida, and although the shipping label listed a Miami return address, the package was actually shipped from Nogales, Arizona. Nogales is a city bordering Mexico that drug-trafficking organizations often use for smuggling drugs into the United States. The package's shipping address was linked to a registered utility holder in Florida, Victor Yoel Perez Cremades.

After removing the narcotics, law enforcement repackaged the FedEx box with non-narcotic items, and an undercover officer delivered it to 4813 North MacDill Avenue in Tampa, the original destination address. Cremades' 14-year-old daughter answered the door and accepted the package. Shortly after the delivery, members of the local police department and the FBI executed a search warrant at the residence.

Cremades was not there. But inside the rented, single-family home, the agents found mail addressed to him and saw that the delivered FedEx box had been placed on a bed in one of the bedrooms. In that same room, in the nightstand there was a stack of thirteen $100 bills, and the closet contained men's clothing, identification belonging to Cremades, and a purple duffel bag. Inside the purple bag were six vacuum-sealed plastic bags containing a total of 3,068 grams of 99% pure methamphetamine, circumstances evidencing that the drugs were meant for distribution. *See United States v. Mercer*, 541 F.3d 1070, 1071 & n.10 (11th Cir. 2008) (discussing that a jury could infer intent to distribute from the fact that the methamphetamine in question was individually packaged in plastic bags). Also inside the purple bag was a pair of jeans with $3,500 cash in the pocket and a Ziplock bag with more than 7,000 blue pills containing a total of 831 grams of fentanyl. Those fentanyl-laced blue pills inside the purple bag resembled the 1,200 blue pills found inside the intercepted FedEx box. Also inside the closet the agents found a Western Union receipt bearing Cremades' name, which revealed that on August 5, 2021 he had transferred $1,500 to

Jose Romero Espinosa in Nogales — the origin city of the intercepted FedEx package.

When the agents searched the kitchen (sometimes referred to in the record as the dining area), they found on the kitchen table another receipt with Cremades' name, also dated August 5, 2021, and showing the same transfer of $1,500. With that copy of the receipt was a note that had "Jose Romero Espinosa," "1500," and "Nogales" handwritten on it. And inside of a black trash bag under the kitchen table, the agents found more methamphetamine — 145.1 grams of 98% purity.

The agents also found in the kitchen three other Western Union receipts for transactions in early August 2021. While none of those three receipts contained Cremades' name, the sender listed on all three of them was someone from Tampa, Florida, and the recipient on one of them was again Jose Romero Espinoza (this time with a slight variation in spelling) in Nogales. The listed recipient for the other two transactions was someone in Culiacan, Sinaloa, the operation site of the Sinaloa Cartel.

At trial, Jamie Walker, FBI agent and member of an investigative task force on drugs and violent gangs, testified that the Sinaloa Cartel is "one of the most prolific drug organizations in the world." And other law enforcement officers testified that it is unlikely that an individual would ship a package containing $40,000 worth of drugs to someone who was not expecting to receive the package. *See generally United States v. Quilca-Carpio*, 118 F.3d 719, 722 (11th Cir. 1997) (explaining that "[a] reasonable jury could infer

from the quantity of drugs seized that a 'prudent smuggler' is not likely to entrust" valuable contraband "to an innocent person without that person's knowledge"). Investigating officers testified that Cremades and his daughter were the only two people known to live in that house, and Cremades had been seen outside of it on the morning of the search.

FBI Special Agent Melissa Montoya testified that during the search of Cremades' house, she oversaw the intake and handling of seized evidence. The government asked her if she recognized a photograph of a spiral notebook opened to a page that contained a handwritten list of names with numbers next to each. Montoya confirmed that she had collected as evidence the handwritten list shown in the photograph. When the government offered the photograph into evidence, Cremades objected. He argued that the prosecution would probably call the notebook a "ledger," but there was no proof of that, no one had laid a foundation as to its significance, and it was irrelevant because there was nothing to suggest what the list was. The court overruled the objection.

Montoya then testified that she had cataloged the notebook as a ledger, and it was found near the black trash bag in the kitchen that contained methamphetamine. She explained that a ledger is "a book or a piece of paper . . . that has either names, nicknames, phone numbers, money, orders, et cetera" that is "commonly used in the distribution of narcotics." On cross-examination, Montoya testified that her FBI experience with ledgers led her to believe the

notebook in the photograph was a ledger used in drug distribution, although she did not know whose handwriting was on it.

Another FBI agent also testified that "[i]n drug trafficking in general, if you see names with dollar amounts next to it, it possibly could be a drug ledger. It's a way of keeping track of how much money is either owed or given to somebody." He also told the jury that when he and other agents entered the house, Cremades' 14-year-old daughter and a man named Eugene Fields were the only people present. The officers interviewed Fields and searched his phone with his consent, but they found nothing to connect him to the FedEx package or any drugs. And there was no mail in the house addressed to anyone other than Cremades.

At the close of the government's case, Cremades moved for a judgment of acquittal on the ground that the evidence was insufficient to support a conviction.[1] The court took the motion under advisement, and then Cremades moved to admit a single exhibit into evidence — a picture of his living room — which the court admitted. Cremades rested, choosing to present no further evidence in his defense. The jury found him guilty on both counts, and the court denied Cremades' earlier motion for judgment of acquittal. The court sentenced him to 180 months imprisonment on each count to run concurrently. He appeals both convictions.

---

[1] Defense counsel did not specify as to which count his motion was directed. In context, however, the implication is that the motion was directed at both counts.

## II.

Cremades contends that the evidence was circumstantial and insufficient to convict him of either the possession with intent to distribute or the conspiracy charge. He argues that "no reasonable trier of fact should have relied [o]n the government's evidence."

We review *de novo* a challenge to the sufficiency of the evidence to "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Mercer*, 541 F.3d at 1074. We view all "evidence in the light most favorable to the verdict and draw all reasonable inferences and credibility choices in the verdict's favor." *United States v. Bird*, 79 F.4th 1344, 1348 (11th Cir. 2023) (quotation marks omitted). We will not overturn a guilty verdict if "any reasonable construction of the evidence" supports the jury's finding beyond a reasonable doubt. *United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020) (quotation marks omitted). It does not matter if the evidence "leaves room for innocent explanations for the defendant's conduct." *Bird*, 79 F.4th at 1348. The evidence does not have to completely foreclose the defendant's innocent explanations, nor does it have to "exclude every reasonable hypothesis" because "a jury is free to choose among the reasonable constructions of the evidence." *United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014) (quotation marks omitted).

And, of course, the law does not look down on circumstantial evidence. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof

beyond a reasonable doubt is required."); *United States v. Kennedy*, 146 F.4th 1054, 1064 (11th Cir. 2025) ("As to his complaint about circumstantial evidence, 'in determining the sufficiency of the prosecution's case, we make no distinction between circumstantial and direct evidence.'") (quoting *United States v. Tate*, 586 F.3d 936, 945 (11th Cir. 2009).

## A.

We begin with Count II. To convict Cremades under § 841(a) for possession with intent to distribute methamphetamine and fentanyl, the government had to "prove three elements: (1) knowledge; (2) possession; and (3) intent to distribute." *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989). Circumstantial evidence can prove all of those elements. *Id.* at 1391–92. Possession may be established through actual or constructive possession. *United States v. Leonard*, 138 F.3d 906, 909 (11th Cir. 1998). Constructive possession exists when a defendant has "dominion or control over the premises" in which the object is kept. *Id.* And "[i]ntent to distribute may be inferred from the amount of the drug involved." *United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir. 2005) (alteration adopted) (quotation marks and citation omitted).

In our *Cochran* decision we affirmed the defendant's conviction under § 841(a)(1), rejecting his contention that there was insufficient evidence to link him to drugs found in a residence that he asserted was not his home. *See United States v. Cochran*, 683 F.3d 1314, 1317–18, 1322 (11th Cir. 2012). In that case, the defendant argued that the evidence did not establish his dominion and control

over the drugs, that there was nothing to link him to the drugs inside the house, and that his mere presence near the drugs was not enough to establish possession. *See id.* at 1322. But the government presented evidence that: he was found standing in the driveway of the home where the drugs were found with a key to the house in his pocket; an officer saw him enter and exit the house before it was searched; the drugs were found in common areas of the house; a letter addressed to the defendant was found in the house; and his daughter stated that he "frequented" the house. *Id.* at 1317–18, 1322. We held the evidence sufficient to sustain the defendant's convictions under § 841(a) for possession with intent to distribute cocaine and cocaine base. *Id.* at 1316, 1322–23. As much or even more evidence supports Cremades' conviction under § 841(a) than supported the conviction in *Cochran*.

Cremades' actual knowledge and possession of the drugs was proven by the large quantities of methamphetamine and fentanyl found in a bedroom and in the kitchen of the 800-square-foot rented house he occupied, which was also the shipping destination of the drug-filled FedEx package. He and his daughter were the only people known to live in the house; the utilities for it were registered to him; and his Social Security card, passport, and mail addressed to him were all found inside the house. And he was seen outside the house on the morning of the search. To top it off, experienced officers testified about the unlikelihood that the recipient of a package containing $40,000 worth of drugs would not know of its contents. All told, there was more than enough evidence for

the jury to find, as it did, that Cremades had actual knowledge of the drugs and possessed them.

As for Cremades' intent to distribute some or all of the drugs, it was proven by the large quantities of methamphetamine and fentanyl that were found in his house and the additional quantities of those drugs in the package that had been addressed to his house and shipped from Nogales, Arizona using a fake return address. Not only that, but also found in the house were: a receipt that showed Cremades' recent transfer of $1,500 to Jose Romero Espinosa in Nogales; an accompanying handwritten note with the same information; $4,800 cash; and six vacuum-sealed plastic bags containing a total of 3,068 grams of 99% pure methamphetamine and a Ziplock bag holding more than 7,000 blue pills that contained 831 grams of fentanyl.

Here's the thing, given the brevity of life and the danger that inevitably arises from consuming large quantities of virtually pure methamphetamine and large numbers of fentanyl pills, there is no chance that Cremades intended to personally consume all of the more than 3,000 grams of high purity methamphetamine or all of those more than 7,000 pills of fentanyl. And if he didn't intend to personally consume the large quantity of drugs, the only other possibility is that he intended to distribute them to someone else, whether to large numbers of end consumers or to other criminals in the distribution chain. *See Leonard*, 138 F.3d at 909 n.3 (concluding that nine kilograms of cocaine was "far more than that involved in personal use and enough to support an inference of intent to

distribute") (citation omitted); *United States v. Gates*, 967 F.2d 497, 499 (11th Cir. 1992) (concluding that two kilograms of cocaine was "far more" than an amount for personal use and was evidence to support an intent to distribute the drugs); *United States v. Tamargo*, 672 F.2d 887, 890 (11th Cir. 1982) ("The jury reasonably could have inferred that one in possession of 2,000 methaqualone tablets intended to distribute the tablets rather than use them for personal consumption.").

The overwhelming evidence presented at trial is more than sufficient to prove beyond a reasonable doubt the jury's finding that Cremades violated § 841(a) by possessing with intent to distribute the charged quantities of methamphetamine and fentanyl. *See Mercer*, 541 F.3d at 1074. The jury's guilty verdict as to Count II stands.

**B.**

So does the jury's guilty verdict as to Count I. To convict Cremades of the drug conspiracy crime under 21 U.S.C. § 846, the government was required to prove: 1) an illegal agreement existed to possess with intent to distribute the drugs; 2) Cremades knew of the agreement; and 3) he knowingly and voluntarily joined it. *See United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002).

Because conspiracy, like other crimes, may be proven by circumstantial evidence, *United States v. Russo*, 717 F.2d 545, 549 (11th Cir. 1983), for the reasons already discussed, *see supra* at 9–11, a reasonable jury could find that there was an agreement to possess methamphetamine and fentanyl with the intent to distribute it, as well as that Cremades knew the scheme was unlawful. That leaves

the question whether Cremades entered the illegal agreement knowingly and voluntarily. Both the evidence and common sense show that he did. Given the large quantities of methamphetamine and fentanyl pills throughout his home and the large amount of cash in his bedroom and closet, and the receipts showing money transfers that occurred a month before the FedEx package's arrival, the jury did not have to work very hard to find beyond a reasonable doubt that Cremades knowingly and voluntarily entered an illegal agreement to distribute drugs. *See Desert Palace, Inc.*, 539 U.S. at 100.

Thus, a "reasonable construction of the evidence" supports the jury's finding beyond a reasonable doubt that Cremades conspired to possess with intent to distribute 500 grams or more of methamphetamine and 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). *Iriele*, 977 F.3d at 1168.

## III.

Cremades contends that the district court's admission of the "drug ledger" over his objection is reversible because the ledger was irrelevant and no foundation was laid for admitting it.

We review a district court's evidentiary ruling only for abuse of discretion. *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013). This standard "affords the district court considerable leeway in evidentiary rulings." *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018) (quotation marks omitted). Under this standard we will reverse only if the evidentiary ruling constitutes manifest error. *Id.* Cremades argues that admitting the drug ledger was manifest error both because it constituted a "clear error of judgment,"

and it involved the application of "the wrong legal standard." *Id.* (quotation marks and citation omitted).

Even if a district court abuses its discretion in an evidentiary ruling, if the error is harmless, we won't reverse on the basis of it. *See United States v. House*, 684 F.3d 1173, 1197 (11th Cir. 2012). A nonconstitutional evidentiary error is harmless and "must be disregarded" unless it affected the defendant's "substantial rights" at trial. Fed. R. Crim. P. 52(a); *House*, 684 F.3d at 1197; *see United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992) ("A district court's erroneous admission of evidence does not warrant reversal if the purported error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."); *cf. United States v. Roy*, 855 F.3d 1133, 1135, 1142–43, 1188 (11th Cir. 2017) (en banc) (explaining, in a case involving constitutional error, that the Constitution guarantees a fair trial, not an errorless one, and reversal for an error that had no influence over the jury's verdict runs afoul of several "vital interests of[] our judicial system," such as promoting public respect for the judicial process by focusing on the "underlying fairness" of the trial; avoiding a "regime of gotcha review"; avoiding litigant abuse of the judicial process; and "conserving scarce judicial resources") (citation omitted).

It is the government's burden to show an error's harmlessness. *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020); *see United States v. Vonn*, 535 U.S. 55, 62 (2002). And, of course, "[o]verwhelming evidence of guilt" may render an erroneous ruling harmless. *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999);

*see also United States v. Hough*, 803 F.3d 1181, 1193 (11th Cir. 2015) (concluding that in light of the evidence presented over eleven days at trial establishing defendant's guilt, "it is inconceivable that the jury would have returned a different verdict based on two answers to two allegedly improper questions").

Cremades argues that what he contends is the erroneous admission of the drug ledger had a substantial prejudicial effect on the outcome of his trial because "it allowed the government and its FBI witness to make purely speculative assumptions before the jury that the piece of paper was a 'drug ledger' written by [] Cremades, when . . . there was . . . no evidence to support th[ose] conclusions." Cremades points to our *Stephens* decision, where we held that the exclusion of "potentially exculpatory" testimony about a confidential informant's access to methamphetamine "more likely than not" influenced the verdict because the testimony could have "played a fairly important role in the jury's deliberations" had it been admitted. *United States v. Stephens*, 365 F.3d 967, 980 (11th Cir. 2004). In that case, however, we observed that the government's case against the defendant, Kenneth Stephens, "suffer[ed] from a wide range of disturbing flaws." *Id.* at 977. Despite extensive surveillance, there was no evidence that law enforcement ever saw or heard any drug transaction between Stephens and the informant. *Id.* The government's entire theory of the case in *Stephens* was that officers had searched their informant so thoroughly before his interactions with Stephens that the methamphetamine in the informant's possession could only have come from Stephens. *Id.* at 979. This was the theory that the defense sought to rebut with the

excluded testimony. *Id.* Because it was clear that law enforcement *did not* search their informant thoroughly or keep him under surveillance, *see id.* at 978–79, we concluded that "additional testimony that [the informant] actually had access to methamphetamine from sources other than Stephens[] and possessed and sold it while he was ostensibly working as [an informant], could have been quite probative to the jury." *Id.* at 980. The erroneous exclusion of "quite probative" evidence favoring the defendant that would have helped him refute the entire theory of the government's case is not harmless error.

But this case is not like *Stephens.* As the government points out, even assuming without deciding that admitting evidence of the drug ledger was an abuse of discretion, it "had no substantial influence on the outcome." *Fortenberry*, 971 F.2d at 722. We've recounted the overwhelming evidence supporting both convictions in our sufficiency-of-the-evidence discussion. *See supra* at 9–12. And we did that without even mentioning anything about the drug ledger. We could leave it out of the sufficiency discussion because the "[o]verwhelming evidence of guilt," *Guzman*, 167 F.3d at 1353, was "uninfected by the [purported] error," *Fortenberry*, 971 F.2d at 722, in admitting the ledger. Any error in the ledger's admission was harmless given all the other evidence presented at trial; "it is inconceivable that the jury would have returned a different verdict," *Hough*, 803 F.3d at 1193, if the ledger had been excluded.

**AFFIRMED.**