[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 6, 2004
THOMAS  K. KAHN
CLERK

No. 02-14656

D.C. Docket No. 01-00066 CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENNETH STEPHENS,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Georgia

**(April 6, 2004)**

Before TJOFLAT, BIRCH and GOODWIN[*], Circuit Judges.

---

[*]Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

TJOFLAT, Circuit Judge:

Kenneth Stephens was convicted of eight counts of drug possession[1] with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1).[2]  He appeals, asking that we vacate his conviction and order a new trial on the grounds that the district court violated both the Federal Rules of Evidence and the United States Constitution in preventing him from calling witnesses who would have cast some doubt on the Government's case.[3]  We agree that this violated the Federal Rules of Evidence and reverse his conviction on counts two through eight, without reaching the constitutional issues.  We affirm Stephens's conviction on count nine.

---

[1]  Stephens's convictions were the culmination of a Georgia Bureau of Investigation ("GBI") operation, which involved a series of controlled buys between Stephens and a confidential informant, Steve Robinson.  Each count of the indictment charged Stephens with drug possession on a different date, corresponding to dates when Robinson purportedly purchased methamphetamine from him.  Count two was for August 20, 2001; count three was for August 27, 2001; count four was for August 31, 2001, count five was for September 6, 2001; count six was for September 11, 2001; count seven was for September 19, 2001; count eight was for September 24, 2001; and count nine was for October 2, 2001.

Count one of the indictment alleged a conspiracy between Stephens and Robinson to sell drugs.  The district court dismissed this count due to insufficiency of the evidence.

[2]  21 U.S.C. § 841(a)(1) provides, "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

[3] Stephens also challenges his sentences, claiming that the district court misapplied the Sentencing Guidelines.  Although we affirm Stephens's conviction on count nine, the district court considered, in framing his sentence on that count, Stephens's convictions on counts two through eight, which we reverse.  Consequently, we vacate Stephens's sentence on count nine and remand the case for resentencing on that count.

I.

We begin in Section A by reciting the largely undisputed facts and procedural history of this case, then turn in Section B to the testimony Stephens sought to introduce that the district court excluded.

A.

Kenneth Stephens was a sixty-two year-old retired store owner with no prior felony convictions who invested in real estate. He was also a handyman who enjoyed tinkering with antique cars. For over twenty-one years, he had been close friends with Price Robinson. After Price died, Stephens became a father figure to Price's son Steve Robinson ("Robinson").

Robinson was a career criminal with a long list of state and federal convictions, including possessing and selling cocaine, possessing meth-amphetamine with intent to distribute, marijuana possession, counterfeiting, possession of a firearm by a felon, and assault. Notwithstanding Robinson's extensive criminal background, Stephens tried to help him reform himself. Stephens and his wife often opened their home to Robinson, inviting him over for breakfast and dinner and allowing him to spend the night. In the late 1990s, after Robinson was let out of federal prison, Stephens gave Robinson a job in his

country store to help him transition back into society, but fired him when he found Robinson using drugs there.[4]

On August 6, 2001, Robinson sold methamphetamine to a confidential informant with the Georgia Bureau of Investigation (GBI) in a controlled buy. The GBI searched Robinson's home and found two bags of methamphetamine, scales, a bottle of VitaBlend (a Vitamin-B product used to "cut" the drug) and a loaded gun. Facing a lengthy prison sentence, Robinson claimed that Stephens sold him the drugs. Robinson agreed to cooperate with the GBI by becoming a confidential informant against him.

GBI Agent Ken Howard had Robinson orchestrate a series of meetings alone with Stephens, at which Robinson would be "wired" so the GBI could hear their conversations. On August 14, 2001, Robinson went over to Stephens's house and told him about the GBI's search of his home and seizure of his drug-related paraphernalia. No alleged drug transactions occurred at this time; it was simply a visit with Stephens of the sort that Robinson had regularly made over the years.

Robinson's next visit to Stephens's home was almost a week later, on

---

[4] Stephens later sold this store, but retained the large storage building near it. He and Robinson would frequently socialize there, and that is where many of the alleged drug transactions occurred.

4

August 20. GBI agents gave Robinson $2,200, telling him to repay Stephens $1,000 that he already owned him, and to purchase two ounces of methamphetamine from Stephens with the remaining $1,200. The money was xeroxed so that the agents would be able to trace the serial numbers later. Robinson was also instructed to talk to Stephens about prior drug transactions that had occurred between them.

When Robinson went to Stephens's house, Robinson repaid him the $1,000, but didn't mention drugs. They agreed to hang out later that day by a large garage near the store Stephens formerly owned where Stephens kept his collection of antique cars that he enjoyed working on, including a '71 Camaro, a '56 Chevrolet, a '65 Plymouth, a Firebird, a '93 Cadillac, a 2001 pickup, and a '90 pickup.[5] It was also where he stored his motor home, tools, lawn mower, and plows.

After setting up this later visit with Stephens, Robinson returned to Howard with the extra $1,200. When it was time to meet, Howard returned the $1,200 to Robinson and sent him to meet with Stephens.[6] Later on, Robinson returned to the

_____

[5] According to the undisputed testimony of Stephens's wife, Stephens had owned most of these cars for a long time, and there is no evidence in the record that they were purchased with the proceeds of drug transactions. According to his wife, Stephens earned approximately $120,000 annually in legitimate income from monthly payments by the people who bought his store.

[6] There is no indication as to where Robinson was or what he did prior to meeting Stephens at his garage.

GBI agents and gave them two clear plastic baggies of methamphetiamine that he claimed Stephens sold him. The agents had the baggies dusted for fingerprints, but no prints surfaced.

The GBI then had Robinson set up several other meetings with Stephens on August 27, August 31, September 6, September 11, September 19, and September 24, 2001. Each of these transpired in roughly the same way. Robinson would call Stephens to ask if he could come over to Stephens's house.[7] Agents would then search Robinson to see if he had drugs, money, or weapons on him, though apparently they never checked his shoes or socks. They also performed a cursory search of Robinson's dilapidated Blazer S.U.V., though they never had a drug dog sniff for drugs and neglected to look in many places drugs could be hidden. They would then attach a recording device to Robinson that allowed them to hear his conversations with Stephens. The agents also inserted a "lipstick" camera into the grille of Robinson's S.U.V. that allowed them to see what was happening in front of the vehicle, but not inside the driver's compartment.

After Robinson and his car were wired, Robinson would drive to Stephens's house with a car of agents trailing approximately 200 yards behind him—far

---

[7] The GBI was supposed to be taping these conversations, but agents forgot to record some of these calls.

enough away that it was almost impossible for them to see into the S.U.V., especially through its tinted rear window. Stephens and Robinson would meet together with their conversations being recorded by the GBI agents. The GBI maintained aerial surveillance over these meetings through the use of video and microwave cameras from a plane flying overhead. After each visit, Robinson would return to the GBI with two bags of methamphetamine ostensibly purchased from Stephens. At no point during any of these meetings did Robinson and Stephens ever discuss drugs or drug dealing, despite Robinson's explicit instructions from the GBI to get Stephens to talk about this.

On October 2, 2001, Robinson called Stephens to set up a visit as usual. Instead of placing the lipstick camera in the grille of Robinson's car, the GBI placed it in the interior of the car, facing out through the windshield (it still could not record anything in the car's interior). When Robinson arrived at Stephens's house, the first thing he did was pop the hood of his car so that the camera could not record anything that was going on. Stephens came outside to meet him, and when he and Robinson began talking, GBI agents rushed to the scene and arrested him.

The agents searched Stephens and found three bags of methamphetamine in one pocket, and several hundred dollar bills in another. The serial numbers on

some of these bills matched the serial numbers from money Robinson had been given by the GBI for his September 19 visit. Stephens was Mirandized and asked where he got the drugs. Stephens replied that he got them from outside his house, gestured toward the northwest corner of his property, and stated that he didn't have any other drugs.

A federal grand jury indicted Stephens for conspiracy to sell methamphetamine and eight counts of possessing methamphetamine with intent to distribute—one count for each alleged transaction with Robinson. See supra note 1. At trial, the district court dismissed the conspiracy charge due to insufficiency of the evidence, and the jury convicted Stephens on each of the possession counts.

## B.

During his opening statement to the jury at the beginning of the trial, Stephens's attorney set forth his theory of the case:

> Steve Robinson was dealing drugs throughout this period of time even after August of 2001, even after he agreed to wear tape recorders in his pocket and wear body bugs transmitting to the GBI. When the GBI wasn't looking, he was still selling methamphetamine. Even when he was working for them, right under their nose.

His theory was that Robinson was setting Stephens up in order to avoid a long prison sentence. He told the jury that the evidence would show that when

Robinson visited Stephens, he could have had methamphetamine from one of his other drug sources already hidden in his S.U.V. When Robinson would return to the GBI agents, he would give them those drugs, claiming they really came from Stephens:

> He had methamphetamine with him when [he] went to [Stephens's] house . . . . He would go to the house, and then he'd drive back, and he'd meet the agents and say, here, I've got some methamphetamine. . . . He'd keep a lot of the money that he was given by the GBI to supposedly buy the methamphetamine.

To substantiate this theory, defense counsel attempted to establish that Robinson had access to drugs from sources other than Stephens, and that he was involved in the methamphetamine trade throughout the entire time he was ostensibly working as a GBI informant. He attempted to call three witnesses to the stand. In a proffer to the district court, defense counsel explained the anticipated contents of their testimony:

> One witness will testify that he had spent almost every day . . . at Mr. Robinson's house. He worked there, did kind of carpentry work or some kind of work at the residence . . . . He said that on the very day after the . . . raid on August the 6th of Mr. Robinson's house, the very next day he went there and Mr. Robinson had six ounces of methamphetamine and bragged about how he had it and they didn't find it. He will describe exactly where it was . . . . [O]nce or twice a week, Mr. Robinson would have the drugs, he would have a bag full of drugs. One time he had a big bowl full of drugs and cash on the kitchen table. . . . He always had money with him, always had a pocket full of money. He was never employed but he always had

9

rolls full of money.

> The next witness is going to testify about a one specific transaction in September. . . . Mr. Robinson went into a bar with a bag full of drugs and offered to supply anybody there, including this witness, with any drugs and bragged about the good quality of the methamphetamine that he had. The third witness, very similar, different date, said that Mr. Robinson came up to him also. This was in the fall, sometime in September. It was the only time he ever saw him with drugs. Robinson went up to him and said he had—said and showed him a bag full of white powder, and the witness said, I don't want anything to do with it, told him he didn't want any of his drugs.

The court excluded the testimony, ruling that none of it was relevant to the question of whether Robinson had methamphetamine from an extrinsic source other than Stephens on any of the specific occasions at issue in the indictment. The judge held, "The mere fact that one on some other time at some other place possessed drugs and/or a sum of money is not proof that at another time they had or possessed. And, therefore, in my opinion, it is not relevant except for the purpose of trying to show that Mr. Robinson was a drug dealer or dealing in drugs at other times. And that's not relevant to this trial . . . ." Stephens challenges the exclusion of this evidence.

District courts enjoy "wide discretion" in making evidentiary rulings. Hamling v. United States, 418 U.S. 87, 108, 94 S. Ct. 2887, 2903, 41 L. Ed. 2d 590 (1974). A defendant may obtain the reversal of a conviction based on an

evidentiary ruling in one of two ways.  First, he may argue that the district court erred in applying a Federal Rule of Evidence; this approach is discussed in Part II. Second, a defendant may contend that, notwithstanding the correctness of the court's evidentiary ruling, the admission or exclusion of a piece of evidence violated a constitutional guarantee.  In many cases, this is essentially making an as-applied constitutional challenge to a particular rule of evidence.  Because we find that the district court erred in applying the Federal Rules of Evidence, we need not reach these constitutional issues.

## II.

To successfully challenge a verdict on the basis of a district court's incorrect evidentiary ruling, a party must follow a three-step process.  First, he must demonstrate either that his claim was adequately preserved or that the ruling constituted plain error.  See Fed. R. Evid. 103(a), (d).  Second, he must establish that the district court abused its discretion in interpreting or applying an evidentiary rule.  See United States v. Todd, 108 F.3d 1329, 1331 (11th Cir. 1997) ("We review a district court's evidentiary rulings under the abuse of discretion standard.").  Finally, he must establish that this error "affected . . . a substantial right."  Fed. R. Evid. 103(a); see also United States v. Sellers, 906 F.2d 597, 601

11

(11th Cir. 1990) ("Even where an abuse of discretion is shown, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected."); 28 U.S.C. § 2111 ("On the hearing of any appeal . . . the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.").

## A.

We begin by assessing whether Stephens adequately preserved his evidentiary claims before the district court. To preserve an objection to a district court's exclusion of certain evidence, "the substance of the evidence [must be] made known to the court by offer or [be] apparent from the context within which questions were asked." Fed. R. Evid. 103(a)(2). In this case, Stephens's attorney made a thorough proffer[8] to the court about the anticipated contents of the excluded witnesses' testimony. Consequently, we have no problem in concluding that the record is sufficiently developed to allow us to review this claim. See United States v. Sheffield, 992 F.2d 1164, 1170 (11th Cir. 1993) ("[B]ecause the trial court and prosecutor were well aware of the substance of the evidence, and

---

[8] We use the terms "proffer" and "offer of proof" interchangeably.

12

the record reflects the substance of the evidence, we find that the defense counsel made an adequate proffer.").

## B.

We now turn to the substance of Stephens's evidentiary claims. Stephens maintains that the district court misapplied several separate rules of evidence in concluding that the proffered testimony of his witnesses should be excluded. Subsection 1 discusses the admissibility of this evidence under Rule 404(b), while Subsection 2 examines Rules 404(a)(3) and 608. We conclude that this testimony was admissible under each of these rules and that the district court should not have excluded it.

### 1.

Federal Rule of Evidence 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Stephens's attorney never argued that he was seeking to introduce the witnesses' testimony simply to show that, because Robinson was a drug dealer on certain prior occasions, he was acting as a drug dealer on the days he interacted with

13

Stephens. Indeed, the whole premise of the Government's case was that Robinson was acting as an undercover drug buyer from Stephens on those occasions.

Instead, defense counsel sought to introduce this evidence "for other purposes"—specifically, to show that Robinson could have obtained the methamphetamine he turned over to the Government from a source other than Stephens. This is directly material to Stephens's defense that Robinson was setting him up just to get out of a lengthy jail sentence. With evidence of Robinson's other drug transactions excluded, the jury could quite reasonably have inferred that the drugs he turned over to the GBI had to have come from Stephens. Consequently, Rule 404(b) did not permit or require the exclusion of this evidence. See United States v. Cohen, 888 F.2d 770, 776 (11th Cir. 1989) ("[Rule 404(b)] is one of inclusion which allows such evidence unless it tends to prove only criminal propensity. The list provided by the rule is not exhaustive and 'the range of relevancy outside the ban is almost infinite.'" (citations omitted)).

## 2.

Federal Rule of Evidence 404(a)(3) states, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion except . . . [e]vidence of the

character of a witness, as provided in rules 607, 608, and 609." This rule establishes a broad prohibition on the introduction of character evidence, subject to an exception permitting the use of character evidence against witnesses under certain circumstances.[9] Stephens's attorney contended at trial that this exception might allow him to introduce character evidence about Robinson because, although he did not testify at trial (he was dead at the time), he was essentially a witness since so much of the Government's case hinged around him.

We are forced to reject this contention because, as used elsewhere in the Federal Rules of Evidence, the term "witness" appears to refer solely to someone whose testimony is actually offered as evidence at trial, and not merely someone with extensive knowledge of or involvement in the events at issue.

The most basic way in which someone offers testimony as evidence at trial is, of course, by testifying. Several provisions in the Rules of Evidence are premised on the notion of a "witness" as being someone who testifies at trial. See Fed. R. Evid. 602 ("A witness may not testify to a matter unless . . . the witness has personal knowledge of the matter."); Rule 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully . . . .");

---

[9] There are other exceptions specified in Fed. R. Evid. 404(a)(1) and (2) which do not even potentially apply here.

15

Rule 605 ("The judge presiding at the trial may not testify in that trial as a witness."). This is perhaps most explicit in Rule 611(a), which states, "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . ."

Indeed, several provisions of Rule 608—to which Rule 404(a) expressly refers—are also premised on the notion that a witness is someone who testifies at trial. For example, Rule 608(b) states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may . . . be inquired into on cross-examination of the witness . . . ." Moreover, this rule—like the others cited above—expressly ties the term "witness" to the notion of giving testimony. Fed.R.Evid. 608(b) ("The giving of testimony, whether by an accused or by any another witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination . . . .").

There are a few circumstances, however, in which an individual may be considered a "witness" without actually testifying at trial. For example, the parties may stipulate to what the individual would have said, thus alleviating the need to call him. Similarly, the contents of the individual's testimony in a prior deposition or judicial proceeding may be entered into evidence at trial. In both cases, the jury is instructed to accept the evidence as if the person had actually testified in person.

16

Thus, in these situations, the person may properly be considered a "constructive" witness because, as a matter of law, the jury is required to treat his or her testimony as if he or she had actually, physically been there. A person does not become a constructive witness in this way, however, simply because the testimony of other, actual witnesses centers around them.

To summarize, based on these provisions, we conclude that the term "witness"—as used throughout the Federal Rules of Evidence and specifically in Rules 404(a) and 607-609—refers only to someone who either testified personally at trial, or whose testimony has been otherwise introduced as the substantive legal equivalent of in-person testimony.[10] Because Robinson was dead at the time of trial, he could not testify in person, and none of his statements were ever offered as the legal equivalent of in-person testimony. Though Robinson's behavior and communications to the GBI formed the crux of the Government's case, that does not mean any of his statements were actually offered as a legal substitute for his testimony. Consequently, the exception to the general prohibition against the introduction of character evidence does not apply.

---

[10] Hearsay statements offered for their truth value would generally not fall within this category, because the jury need not accept as true the fact that the declarant uttered it. Moreover, there is a special rule regarding the credibility of hearsay declarants which expressly distinguishes between such declarants and "witnesses." See Fed. R. Evid. 806.

17

Nevertheless, Stephens's claim remains valid. Rule 404(a)'s underlying prohibition against the use of character evidence applies only where that evidence is being used to "prov[e] action in conformity therewith on a particular occasion." The Government argues that Stephens intended merely to show that Robinson was a bad person and wanted to simply paint an undesirable picture of him as a drug dealer. As discussed in the preceding Section, however, Stephens's attorney articulated a variety of important reasons why he needed to introduce the evidence other than simply to portray Robinson—and by extension the Government's entire case, which essentially rested upon him—as a bad person. Consequently, Rule 404(a) did not require or permit the exclusion of this evidence.

## C.

Having established that the district court abused its discretion in excluding potentially exculpatory evidence, we now turn to the final prong of our analysis and determine whether this error affected the defendant's substantial rights.[11] Courts have interpreted this phrase to mean that an erroneous evidentiary ruling is

---

[11] This standard requires that the error be subject to a "harmless error" analysis. The nature of harmless error analysis set forth in Kotteakos v. United States, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557 (1946), for nonconstitutional errors such as this—which places the burden on the defendant—is somewhat more rigorous than the level articulated in Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967)—which places the burden on the Government.

a basis for reversal only if the defendant can demonstrate that the error probably had a "substantial influence" on the jury's verdict. Kotteakos v. United States, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557 (1946);[12] see also United States v. Arias-Diaz, 497 F.2d 165, 171 (5th Cir. 1974) ("The standard applicable to nonconstitutional error was stated in Kotteakos[.]").  As the Kotteakos Court emphasized, "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand."  328 U.S. at 765, 66 S. Ct. at 1248; see also Duest, 997 F.2d at 1339 ("The essential question is: Did the constitutional error 'substantially influence' the verdict, or, at least, does a 'grave doubt' exist as to whether it did?").

GBI agents actually found methamphetamine in Stephens's pocket on the day of his arrest, October 2, 2001.  The exclusion of the proffered testimony could not have had an impact on the jury's deliberations regarding this event; consequently, we affirm Stephens's conviction on count nine.

---

[12] This standard also applies to constitutional errors on habeas review. See Duest v. Singletary, 997 F.2d 1336, 1338 (11th Cir. 1993) ("[T]he standard for harmless constitutional error in federal habeas corpus cases [is] the harmless-error standard federal appellate courts use on direct review as to nonconstitutional error." (citation omitted)).

The Government lacks such concrete evidence regarding counts two through eight of the indictment, however, and its case against Stephens suffers from a wide range of disturbing flaws. Most notably, most of the evidence that one would normally expect to corroborate extensive drug-dealing allegations is absent in this case. For example, despite extensive surveillance over the course of several visits—including agents trailing Robinson, hidden video and audio camera, and aerial surveillance—the GBI never actually saw or heard a drug transaction between Stephens and Robinson. This point was made most forcefully on cross-examination of GBI Agent Cagle, one of the case agents:

Q: Okay. With regards to this case, the informant [Robinson], he was wearing body wires, there was cameras in the car that he was using, you all even used aerial surveillance in this case; is that right?
A: We did.
Q: And this took place over a period of three months, October, September, and August, correct?
A: It did.
Q: In those three months, did you all, with all the surveillance equipment and everything else you had going, I believe you had several agents, somebody testified that half your office was working on this case, did anybody ever see Kenneth Stephens sell drugs or buy drugs from anybody else during this course of that three months?
A: We did not.

Having watched each of the surveillance videos, we are unable to conclude that any of them unambiguously shows a drug transaction occurred. In at least three of the videos—August 31, September 19, and September 24—there is nothing even

20

vaguely resembling a drug sale; Stephens and Robinson never hand anything to each other or put anything into their pockets. On September 6, Stephens hands Robinson a watermelon, which he carries back to his S.U.V. They had been talking about watermelons, and there is nothing on the tape that makes this seem suspicious.

Only two tapes—August 20 and September 11—show something that could possibly have been a drug transaction, but Stephens and Robinson were far from the camera and it was not bright enough to clearly see what happened. At one point on the August 20 tape, Robinson's back is to the camera and he is blocking the view of Stephens. Stephens reaches for a large bag on the right of the screen, and Robinson can be seen putting something in his pocket. We are unable to see whether Stephens removed anything from the bag or handed anything to Robinson, we cannot see what happened to the large bag, and we are unable to discern whether Robinson gave Stephens any money. While this certainly might be evidence somewhat suggesting a drug deal, it is by no means conclusive.

Similarly, on the September 11 tape, the men are standing in the garage of Stephens's home. At one point, it appears as if something might have changed hands, and we see Robinson place something in his pocket, but due to distance and lighting, it is impossible to see what it was or even to be certain that Stephens

21

actually passed something to Robinson. Consequently, we are unable to conclude that the jury would have been unmoved by the potentially persuasive excluded evidence.

We are also bound to mention that all of these visits seemed like normal social calls. Many times, Robinson went into the home and we can hear him eating breakfast with Stephens and his wife. The conversation is wide-ranging and touches upon a variety of areas: Stephens's trip to the bank and post office, Robinson's problems with women, Robinson's drinking problem, Robinson's smoking problem, Robinson's career problems, Stephens's father's death, how Stephens gets tired more easily now that he's older, cars, the lawn—nothing that suggests that this is simply a front for a drug deal. Consequently, even in light of the video evidence, it is quite possible that the excluded witness testimony could have substantially influenced the jury's deliberations.

The Government's case suffered from a good number of other deficiencies, as well. For example, despite searching "every square inch of [Stephens's] house . . . inside and out . . . top to bottom," the GBI failed to locate any drugs. Additionally, although the GBI seized four boxes of financial records from Stephens's home, they were unable to find a single shred of evidence suggesting drug transactions, including deposits of the money Robinson allegedly gave him.

22

We also note that no physical evidence tied Stephens to Robinson's bags of methamphetamine. Indeed, perhaps even more disturbing than the absence of his fingerprints from the one bag the GBI actually tested for prints is the fact that they didn't even bother to fingerprint any of the other bags Robinson gave them. Finally, it is at least somewhat relevant that Carolyn Stephens, Stephens's wife, testified that she had never seen illegal drugs anywhere in her home, had never seen her husband dealing drugs, and that he never walked around with unexplained large amounts of cash.

The only actual link between Stephens and Robinson's bags of methamphetamine is Robinson's claims that he obtained them from Stephens. In light of Robinson's extensive criminal history, and the fact that he originally implicated Stephens to avoid a lengthy drug sentence, such a foundation is shaky, at best. The entire basis of the Government's case is that, because he and his car were searched so thoroughly prior to his visits with Stephens, Robinson could not have gotten the methamphetamine he returned to the GBI from anywhere other than Stephens. This is exactly the theory defense counsel wished to rebut.

Even independent of the excluded witnesses, Stephens's attorney dramatically called into question the sufficiency of the GBI's search of Robinson's S.U.V. Cross-examining Howard, the GBI agent who searched the car, defense

counsel established that the vehicle was in "rugged" condition, and most of the rugs and seats were ripped.

> Q: When you would search the car, would you take your flashlight and look up inside the springs to see if you could see anything hidden in there?
> A: No, sir.
> Q: Did you ever look inside the leather from the side underneath the seat?
> A: No, sir.
> Q: It would take all of about one second for somebody to reach down from the driver seat and reach under the seat? . . .
> A: For me, yes, sir. . . .
> Q: And you didn't pull the vents off?
> A: No, sir. . . .
> Q: Okay. This [vent] goes right up against the back seat, snaps right off and on, you didn't pull that off and look in there, did you?
> A: No, sir. . . .
> Q: Did you look at all in the areas beneath where the seat would latch down?
> A: No, sir.
> Q: Did you look underneath the rug, underneath the area where the brake pedal is, lift up the rug to see if anything was hiding under there?
> A: No, sir.

On redirect, Howard admitted he never searched under the dashboard. Howard also testified that once Robinson pulled into Stephens's driveway, he had no visual contact with him and so was not able to see whether or not he was retrieving something from a hidden location in the car.

Later in the trial, defense counsel called Robinson's sister, Paula Robinson, who had taken possession of Robinson's S.U.V. She testified extensively as to all the places in the car where drugs could be hidden, including a plastic shell running

24

along the interior roof of the vehicle, the holes in the floor of the car into which the seats could be connected, the holes in the carpet near the brake pedal, under the cushions of the driver's seat, a plastic area near the driver's seat, and in back of a metal bar behind the torn upholstery of the passenger's seat.

Further exacerbating the problems with the Government's case is that the GBI failed to keep Robinson under any meaningful form of surveillance while he was ostensibly working as a confidential informant for them. Despite his long history of involvement with drugs, they never searched his apartment during his tenure as an informant and never made him submit to a drug test.

Finally, we note that, in closing arguments to the jury at the end of the trial, Stephens's attorney cast significant doubt on the testimony of Agent Cagle about Stephens's confession:

> They talk about Kenneth Stephens made a statement, confessed to everything, saying it's all mine. All right. They have got three recorders on their man, they have got several cars there. They have got video. Why not videotape his confession so there is no doubt in our minds that he actually said those words? Why not take that recording it so we can orally hear that he said those words? Why not do a written statement like these agents do every day so we can see what he said? And if he really said those words, that those drugs are mine, why not follow up if Mr. Stephens is coming clean and say, Mr. Stephens, could you show me where your drugs are in the woods? Mr. Stephens, can you tell me who your supplier is? Mr. Stephens, what happend to your money? Why not just ask him all those things? . . . They don't record it, videotape it. We just have to take

their word for it.

In light of these powerful considerations, additional testimony that Robinson actually had access to methamphetamine from sources other than Stephens, and possessed and sold it while he was ostensibly working as a GBI informant, could have been quite probative to the jury. Without any indication that Robinson had any other ways of obtaining the cocaine, the plausibility of defense counsel's theory of the case was significantly undermined.

The district court claimed that this evidence was not relevant because it didn't demonstrate that Robinson actually had drugs from outside sources on the specific dates when he allegedly engaged in drug transactions with Stephens. This reasoning establishes too high of a threshold for the introduction of potentially exculpatory evidence. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence." Fed. R. Evid. 401. While the excluded evidence does not establish with certainty that Robinson actually hid drugs from one of these outside sources into his car, it bolsters the defense theory that he might have done this by demonstrating that he had the physical means of doing so, and that the GBI was not aware of his drug-related activities.

When considered in light of Robinson's criminal record, the insufficiency of the searches of his S.U.V., and the lack of much substantial corroborating evidence independent of Robinson that Stephens provided Robinson with methamphetamine, we cannot conclude that the excluded evidence was of <u>de minimis</u> significance. We find that the exclusion of the proffered testimony was more likely than not a substantial factor in Stephens's conviction. Had it been introduced, it could very well have played a fairly important role in the jury's deliberations. Consequently, we reverse Stephens's convictions on counts two through eight, remand for a new trial on those counts, and vacate Stephens's sentence on count nine. <u>See</u> <u>supra</u> note 3.

SO ORDERED.