[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14928
_____

D.C. Docket No. 1:12-cr-20157-KMM-5

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RAMON ENRIQUE ACOSTA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 23, 2016)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and VOORHEES,[*]
District Judge.

---

[*] Honorable Richard L. Voorhees, United States District Judge for the Western District of
North Carolina, sitting by designation.

PER CURIAM:

Ramon Acosta, an airplane mechanic by trade, participated in a scheme to smuggle cocaine into the United States by concealing it in the reserve fuel tanks of private airplanes. He was convicted by a jury of (1) conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; (2) importing more than five kilograms of cocaine into the United States, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2; (3) conspiracy to possess cocaine with intent to distribute it, in violation of 21 U.S.C. § 846; and (4) possession of five kilograms or more of cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

On appeal, Acosta challenges his convictions on numerous grounds. After reviewing the record and briefing, and with the benefit of oral argument, we find no reversible error in the underlying proceedings. Acosta raises two issues on appeal that we believe worthy of further discussion, however: (1) whether the district court abused its discretion in admitting evidence of Acosta's uncharged conduct because it constituted either inadmissible bad acts evidence or inadmissible hearsay and (2) whether the district court's jury instructions constructively amended his indictment by impermissibly broadening the possible bases for his convictions beyond what was contained in the indictment.

2

Ultimately, though, these issues do not warrant reversal of Acosta's convictions; we therefore affirm.

## I. BACKGROUND

At the time of his involvement in the charged drug trafficking conspiracy, Acosta was a Federal Aviation Authority-certified mechanic. He performed general maintenance and repair work for private aircraft. Acosta's work as an airplane mechanic eventually brought him into contact with Paul Cordoba, a pilot and drug smuggler. Cordoba was the head of a drug trafficking operation that smuggled drugs from Venezuela into Florida aboard his planes.

Acosta's first encounter with Cordoba's drug trafficking activities occurred in 2007, when Cordoba and Jefferson Castillo, one of Cordoba's associates, smuggled marijuana from Arizona to Florida aboard a small prop plane. While flying from Arizona to Florida, the two stopped in Dallas to refuel at the hanger where Acosta was employed. They decided to spend the night and stored the airplane, which still contained the smuggled marijuana, in the hanger with Acosta's permission. When Castillo expressed concern about leaving the plane in the hanger, Cordoba assured him that Acosta was a friend and that there would not be any problems; however, it is unclear from the record whether Acosta was aware that the plane contained marijuana.

3

Subsequently, Acosta became more directly involved with Cordoba's drug trafficking. Sometime after Cordoba and Castillo's visit, Acosta helped Cordoba modify the black box in one of Cordoba's planes so that drugs could be hidden inside. Cordoba used the modified black box to smuggle drugs into the United States on two occasions.

From there, Cordoba and Acosta continued to experiment with smuggling methods. Acosta proposed smuggling drugs in the reserve fuel tanks of Cordoba's planes. When Cordoba ultimately decided to implement this proposal, he recruited Acosta to remove the drugs from the fuel tanks upon the planes' arrival in the United States. The scheme also involved a number of other participants beyond Cordoba and Acosta, including Francisco Gamero Medina ("Gamero"), an airline mechanic in Venezuela; Cordoba's son Marlon Cordoba ("Marlon"); and Rediel Rodriguez, a drug distributor in Florida.

Cordoba flew a plane to Venezuela, where Gamero loaded a shipment of cocaine into the plane's reserve fuel tank, in May 2008. Cordoba flew the plane back to the United States and, after making several stops, brought the plane to Acosta in Dallas. There, Acosta removed the cocaine from the plane, placed the drugs in briefcases, and loaded them back onto the plane for transport to Florida, where Rodriguez sold the drugs.

4

Cordoba organized a similar smuggling operation in November of that year. This time, Marlon flew with a pilot to Venezuela, where Gamero loaded a shipment of cocaine into the plane's reserve fuel tank. Marlon then flew the plane to the Bahamas, where he met with Cordoba. There, the two switched planes and flew both to Fort Lauderdale, Florida. The next day, Cordoba, Marlon, Gamero, and a few others flew the plane carrying the smuggled drugs to Acosta's hanger in Texas. Once the plane arrived in the hanger, Acosta and Gamero removed the cocaine from the plane's reserve fuel tank. Cordoba and the other conspirators then repacked the cocaine in suitcases, loaded them aboard the plane, and flew back to Florida.

Cordoba arranged a final smuggling operation in August 2009. In contrast to Acosta's role in the prior two smuggling operations, however, his role in this final scheme was limited. Although Acosta was aware that Cordoba was planning to bring a load of cocaine into the United States, he was excluded from the operation at Rodriguez's suggestion for charging too high a fee. Although Acosta did not directly participate in the final trip, Rodriguez offered to pay him $50,000 in "hush money." Trial Tr. at 158 (Doc. 442).[1]

Rodriguez planned to pay Acosta by selling one of the planes used in the conspiracy. The plane was owned, in name, by Rodriguez's girlfriend Kimberly

---

[1] "Doc." refers to the docket entry in the district court record in this case.

5

Rosselle.[2]  But Rodriguez ultimately decided not to sell the plane after police began an investigation into the trafficking conspiracy.   Police eventually arrested Rodriguez, at which time Cordoba tried to convince Rosselle to transfer ownership of the plane to him.  When Rosselle refused, Acosta placed a mechanic's lien on the plane, presumably to encourage Rosselle to sell the plane to Cordoba and to secure for himself the payment Rodriguez promised.  When Cordoba eventually acquired ownership of the plane, Acosta rescinded the lien.

Acosta was arrested and charged with conspiracy to import cocaine, importation of cocaine, conspiracy to possess cocaine with an intent to distribute, and possession of cocaine with an intent to distribute.  Notably, although there was evidence of his involvement in several different smuggling operations, Acosta was indicted only for his participation in the November 2008 trip.

At Acosta's trial, the government presented evidence of his involvement in Cordoba's trafficking operation.  Both Castillo and Rodriguez testified as to Acosta's involvement.  Their testimony covered Acosta's participation beginning with Cordoba and Castillo's layover in 2007 and through the final smuggling trip in August 2009.  Both Castillo and Rodriguez testified in part based on their personal experiences and in part based on their conversations with Cordoba, who

---

[2] The conspirators put the plane in Rosselle's name because some already owned planes in their names, while others were not U.S. citizens and thus could not file the necessary paperwork to establish ownership.

had fled the country and did not testify at trial.  In addition to testimony from Rodriguez and Castillo, the government presented evidence that Cordoba's flight records were consistent with the government's characterization of the trafficking conspiracy and Acosta's involvement.  The government also introduced testimony that Acosta received suspicious payments consistent with compensation for drug trafficking.  The jury ultimately found Acosta guilty on all four counts.  Acosta filed a motion for a new trial and a motion for acquittal.  The district court denied both motions, and Acosta filed a timely notice of appeal.

## II. ANALYSIS

### A. Admission of Evidence Regarding Uncharged Conduct

Acosta contends that the district court erred when it admitted testimony about his participation in several instances of uncharged and arguably criminal conduct.  Specifically, Acosta takes issue with the admission of evidence concerning: (1) his overnight housing of an airplane containing smuggled marijuana, (2) his assistance in modifying an airplane black box to smuggle cocaine, (3) his placement of a mechanic's lien on the plane owned (at least on paper) by Rosselle, and (4) his receipt of suspicious payments from Cordoba.  He contends that the district court should have refused to admit testimony about these events because the testimony was inadmissible either as (1) bad acts evidence under Federal Rule of Evidence 404(b) or (2) hearsay under Federal Rule of

7

Evidence 802.  We conclude the district court did not abuse its discretion in admitting testimony concerning Acosta's uncharged conduct.

### 1.    Standard of Review

To successfully challenge a verdict based on an incorrect evidentiary ruling, a defendant must establish that (1) his claim was adequately preserved; (2) the district court abused its discretion in interpreting or applying an evidentiary rule; and (3) this error affected a substantial right.  *United States v. Stephens*, 365 F.3d 967, 974 (11th Cir. 2004).  Although Acosta raised a Rule 404(b) objection at trial, he never raised a hearsay objection.  We thus review his contention that the district court improperly admitted hearsay testimony for plain error.  *United States v. Sorondo*, 845 F.2d 945, 948 (11th Cir. 1988).  "Under plain-error review, the defendant has the burden to show that there is (1) error (2) that is plain and (3) that affects substantial rights."  *United States v. Monroe*, 353 F.3d 1346, 1349 (11th Cir. 2003) (alteration adopted) (internal quotation marks omitted).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Lejarde-Rada*, 319 F.3d 1288, 1290 (11th Cir. 2003) (alteration adopted) (internal quotation marks omitted).

8

### 2.    Admissibility Under Rule 404(b)

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such evidence may, however, be admissible if it is inextricably intertwined with the evidence of the charged offense.  *United States v. Cancelliere*, 69 F.3d 1116, 1124 (11th Cir. 1995).  Stated differently, Rule 404(b) does not apply where bad acts evidence concerns the "context, motive, and set-up of the crime" and is "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."  *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985).  Evidence of uncharged conduct may also "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

The bad acts evidence Acosta highlights was admissible because it was inextricably intertwined with the evidence of his charged offense.  To begin with, testimony concerning the marijuana smuggling and the black box modification was necessary to help the jury "understand[] . . . the context of the government's case" against Acosta because the evidence "explained the relationship" between Acosta

9

and his co-conspirators as well as "the goal of the conspiracy." *United States v. McLean*, 138 F.3d 1398, 1404 (11th Cir. 1998). These two activities showed how Acosta met many of the participants in the trafficking operation, how he was integrated into the conspiracy, and the evolving sophistication of the trafficking operation as time passed.[3] *See United States v. Troya*, 733 F.3d 1125, 1132 (11th Cir. 2013) (evidence admissible because it "established the method by which Appellants obtained drugs to distribute"); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1516 (11th Cir. 1992) (evidence was intrinsic when it concerned "the formation of the conspiracy" and "basic 'structural' evidence" concerning the roles and motives of the participants in the conspiracy).

Evidence concerning the other two acts at issue—Acosta's placement of a mechanic's lien on the plane and his receipt of suspicious payments—was also inextricably intertwined with the charged conspiracy. That evidence helped explain how Acosta was remunerated for his participation in the conspiracy.

---

[3] Acosta also asserts that evidence concerning the marijuana smuggling and black box modification was inadmissible because there was insufficient evidence demonstrating that he participated in those incidents with knowledge of their criminal nature. But even granting that point, the evidence was nonetheless admissible because it concerned the actions of Acosta's co-conspirators. *See United States v. Meester*, 762 F.2d 867, 877 (11th Cir. 1985) (finding that evidence that "documented crimes committed by other members of the conspiracy" was "intertwined with the evidence of the ongoing conspiracies and so [could not] be labeled 'extrinsic'"); *see also United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1210 (11th Cir. 2009) (observing that "evidence that an unindicted co-conspirator had engaged in crimes similar to those charged against the defendants was admissible because it served to establish a background for the later substantive acts charged in the indictment and was therefore relevant to prove the existence and purpose of the ongoing conspiracies" (internal quotation marks omitted)).

Acosta's placement of the lien and his receipt of suspicious payments "arose out of the same transaction or series of transactions as the charged offense" and, as such, evidence concerning them did not constitute extrinsic evidence and was admissible under Rule 404(b). *United States v. Collins*, 779 F.2d 1520, 1532 (11th Cir. 1986). Nor does it matter that this conduct arguably occurred after the conclusion of the conspiracy. "Carefully circumscribed evidence of criminal activity after the conclusion of the conspiracy may be admissible to 'complete the story' of the conspiracy." *Lehder-Rivas*, 955 F.2d at 1516.

Even if the evidence at issue was not inextricably intertwined with the offenses charged in Acosta's indictment, it was probative of something other than Acosta's criminal propensity, and thus admissible nonetheless. For evidence of other crimes or acts to be admissible under such a theory, the evidence must meet three requirements: "(1) it must be relevant to an issue other than [the] defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy [Federal Rule of Evidence] 403." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).

Evidence concerning all four of the acts at issue here passes muster under this test. First, the evidence was probative of something other than Acosta's

11

criminal propensity—namely, his criminal intent.   Acosta's principal defense at trial was that he was unaware of and uninvolved in any of Cordoba's criminal ventures.  He argued that his transactions with Cordoba were strictly above-board. Thus, at trial the government bore the burden of proving that Acosta knowingly participated in the trafficking conspiracy.  *See id.* at 1345 ("A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." (internal quotation marks omitted)).  And evidence that Acosta willingly participated in a prior criminal activity makes it more likely that he intended to participate in the charged conspiracy.  *See United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995) ("[B]ecause the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." (internal quotation marks omitted)); *see also United States v. Jernigan,* 341 F.3d 1273, 1280 (11th Cir. 2003) (describing the relevancy element of the Rule 404(b) test as a "rule of inclusion").

Second, there was sufficient evidence to enable the jury to find that Acosta performed all four of the acts in question.  Generally speaking, "the uncorroborated word of an accomplice . . . provides a sufficient basis for concluding that the defendant committed extrinsic acts admissible under Rule 404(b)."  *United States*

*v. Dickerson,* 248 F.3d 1036, 1047 (11th Cir. 2001) (alteration in original) (internal quotation marks omitted).  Castillo and Rodriguez testified as to Acosta's role in Cordoba and Castillo's 2007 layover and the modification of the black box in 2007.  The government also presented testimony and documentary evidence of Acosta's placement of a lien on Rosselle's plane and his receipt of suspicious payments.

Third, and finally, the probative value of the contested evidence outweighed its prejudicial impact.  In determining whether the probative value of evidence outweighs its prejudicial impact, a district court must apply "a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Jernigan*, 341 F.3d at 1282 (internal marks omitted).  We consider the evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Id.* at 1284 (internal quotation marks omitted).  Indeed, we have explained that, even when this balancing test is close, "it is precisely these close questions that give rise to the deferential abuse of discretion standard of review." *Id.* at 1285.

As described above, Acosta's principal defense at trial was the lack of criminal intent, and the evidence concerning Acosta's uncharged conduct spoke to his criminal intent.  As such, the evidence was highly probative. *See Delgado*, 56

F.3d at 1366 (observing that "[t]he greater the government's need for evidence of intent, the more likely that the probative value will outweigh any possible prejudice" (internal quotation marks omitted)).  There was also minimal risk that its admission would unduly prejudice Acosta.  The evidence all concerned the charged conspiracy in one way or another, either because it established the modus operandi of the conspirators or the conspiracy's fallout and aftermath.  Thus, it seems more likely that the jury used it for its proper purpose of establishing Acosta's knowing participation in the drug conspiracy and less likely that the jury used it to draw an improper inference about Acosta's general propensity to engage in criminal conduct.  In fact, Acosta himself presents no compelling reason why testimony concerning these acts substantially prejudiced him.  And, even if there was some risk that the jury could have drawn improper inferences from the evidence presented, "any unfair prejudice . . was mitigated by the district court's limiting instruction to the jury." *Edouard*, 485 F.3d at 1346.  The district court therefore committed no abuse of discretion in declining to exclude the evidence under Rule 404(b).

### 3.    Admissibility under Rule 802

Concluding that evidence of Acosta's bad acts was admissible under Rule 404(b) is insufficient to end our inquiry, however, because Acosta also contends that the evidence was inadmissible for a different reason: it was hearsay.  He points

14

to portions of Castillo and Rodriguez's testimony where they each described statements made by Cordoba about Acosta's involvement in various stages of the trafficking conspiracy.   A statement constitutes hearsay if it was made out of court and a party offers it in evidence to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  And such hearsay is generally inadmissible. *See* Fed. R. Evid. 802.

Even were we to agree that the testimony Acosta identifies constituted inadmissible hearsay and that the district court plainly erred in admitting it for that reason (or, for that matter, any other reason), we would nonetheless affirm his convictions because Acosta has failed to demonstrate the admission of that testimony affected a substantial right.  *Stephens*, 365 F.3d at 974.  "[W]here an [evidentiary] error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Hawkins,* 905 F.2d 1489, 1493 (11th Cir. 1990).

Had the district court excluded the evidence Acosta identifies, there was ample other evidence supporting the jury's guilty verdict.[4]  Rodriguez testified based on his personal knowledge of Acosta's involvement in the November 2008 trafficking operation and recounted personally observing Acosta remove cocaine from the reserve tank of Cordoba's plane.  Beyond that testimony, the government

---

[4] Remember, Acosta was only charged and convicted of involvement in the November 2008 smuggling operation.

15

presented evidence of the suspicious flight patterns of Cordoba's planes and how those flight patterns lined up with descriptions of the trafficking scheme in testimony provided by Rodriguez and Castillo. This evidence, which was uninfected by the purported errors Acosta identifies, is sufficient to support the jury's verdict. We cannot conclude that the evidentiary errors Acosta highlights on appeal, to the extent they are in fact errors, had a substantial effect on the verdict. Reversal is therefore unwarranted on that basis. *Hawkins*, 705 F.2d at 1493.

## B. Jury Instructions

The second issue we address also concerns the evidence of Acosta's uncharged conduct, albeit tangentially so. Acosta contends that the district court instructed the jury that it could consider the bad acts evidence to convict him of crimes that had not been charged in the indictment. In doing so, Acosta argues, the district court's jury instructions constructively amended the indictment.

"A fundamental principle stemming from [the Fifth A]mendment is that a defendant can only be convicted for a crime charged in the indictment." *United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). Altering or expanding the essential elements of an offense "to broaden the possible bases for conviction beyond what is contained in the indictment" constructively amends the indictment

and constitutes per se reversible error.[5]  *Id.* at 633-34.  "[S]uch an instruction violates a defendant's constitutional right to be tried on only those charges presented in a grand jury indictment and creates the possibility that the defendant may have been convicted on grounds not alleged in the indictment."  *Cancelliere*, 69 F.3d at 1121.  "In determining whether an indictment was constructively amended, we must assess . . . the court's instructions 'in context' to see whether the indictment was expanded either literally or in effect."  *United States v. Castro*, 89 F.3d 1443, 1453 (11th Cir. 1996).

When instructing the jury on how it could consider evidence of Acosta's uncharged conduct, the district court stated:

> With respect to the conspiracy counts, the [bad acts] evidence that you have heard relates to and may be considered by you as evidence of whether the defendant—whether there was a conspiracy and whether this defendant willfully participated in that conspiracy.
>
> . . . .
>
> With respect to the conspiracy count, you may consider this evidence to establish, one, the existence of any conspiracy, whether it be the conspiracy to import with intent to distribute or the conspiracy to possess—conspiracy to import or the conspiracy to possess with intent to distribute, and whether the defendant was a willful participant in that conspiracy.

---

[5] The government contends that any error arising out of the constructive amendment of Acosta's indictment is not per se reversible because Acosta never raised that issue before the district court; thus, plain error review applies.  *See United States v. Madden*, 733 F.3d 1314, 1319 (11th Cir. 2013).  Acosta responds that he objected to the jury instructions as a whole and that this general objection was sufficient to preserve the constructive amendment issue for appeal.  We need not resolve the question of whether Acosta properly preserved an objection to the constructive amendment of his indictment, however, because we conclude that no constructive amendment occurred.

17

Trial Tr. at 189-91 (Doc. 443). Acosta reads the final quoted paragraph of the instruction as informing the jurors that they could use evidence of his uncharged conduct to convict him of "*any* conspiracy," presumably even those not charged in his indictment. *Id.* at 191 (emphasis added). But Acosta's narrow focus on that single phrase largely ignores the context in which it was used.

When we consider that context, it becomes clear that the district court was not instructing the jury that it could convict Acosta of any conspiracy under the sun; rather, the court was instructing the jury that it could use evidence of Acosta's uncharged conduct to convict him of any conspiracy charged *in the indictment*. The district court began the sentence in question with the qualifying phrase, "[w]ith respect to the conspiracy count"—that is, the conspiracy charged. Then, the court did not state that Acosta's bad acts could be used to establish his participation in "any conspiracy," it stated that the evidence could be used to establish Acosta's participation in "any conspiracy, *whether it be* the . . . conspiracy to import or the conspiracy to possess with intent to distribute." *Id.* (emphasis added). Thus, despite the breadth of the words "any conspiracy" when read in a vacuum, the district court narrowed the universe of possible conspiracies to two: conspiracy to import cocaine and conspiracy to possess cocaine with the intent to distribute it, both of which were charged in Acosta's indictment. And, lest there be any doubt that this interpretation is correct, the court clarified that the

18

jury could only convict Acosta of charges included in the indictment, stating, "I caution you that [Acosta] is on trial *only* for the specific crimes charged in the indictment. You're here to determine from the evidence in this case whether [Acosta] is guilty or not guilty of those specific crimes." Jury Instr. at 21 (Doc. 402). After considering the district court's instruction as a whole, "we do not believe the jury could have convicted [Acosta] based upon a charge not contained in the indictment" and thus conclude that the district court's jury instructions did not constructively amend his indictment. *Castro*, 89 F.3d at 1453.

### III. CONCLUSION

We find no reversible error in the underlying proceedings and therefore affirm the judgment of the district court.

**AFFIRMED.**